UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Sylvanus B. McBryde, et al.,                          Case No. 3:15-cv-2498

                       Plaintiffs,

           v.                                    MEMORANDUM OPINION
                                                     AND ORDER

A Renewed Mind,

                       Defendant.

## I.     INTRODUCTION

Plaintiffs Sylvanus B. McBryde and Samantha S. Nance sued Defendant A Renewed Mind ("ARM"), alleging Defendant discriminated against them on the basis of their race and retaliated against them for filing charges of discrimination with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC"). McBryde also alleges ARM discriminated against him on the basis of his sex. ARM has filed motions for summary judgment as to McBryde and Nance's claims. (Doc. No. 15 and Doc. No. 16). McBryde and Nance filed briefs in opposition to these motions, and ARM filed briefs in reply. While these motions were pending, Nance and ARM stipulated to the dismissal of her claims with prejudice. (Doc. No. 42). For the reasons stated below, Defendant's motion for summary judgment on McBryde's claims is granted.

## II.     BACKGROUND

McBryde began working as a qualified mental health specialist and chemical dependency counselor with ARM in October 2009. McBryde helped to develop and expand an ARM mental

health and substance abuse treatment program known as Guided Paths. He eventually held the titles of Program Manager and later Program Director for Guided Paths.

School and youth-based services were a large component of the Guided Paths program, though the program also served adults with substance abuse issues. Guided Paths received some state funding, as well as funding from grants. McBryde worked as an independent contractor until June 2014, when he became an ARM employee. This change in employment status did not change McBryde's job duties or responsibilities.

Nance began working for ARM as a case manager in April 2010. She also helped to develop the Guided Paths program, ultimately becoming a Program Manager in November 2013. Nance worked directly with at-risk youth at several schools with whom ARM contracted in connection with Guided Paths.

McBryde consistently received high marks on his annual employee performance evaluations. McBryde received strong reviews for expanding Guided Paths, exceeding productivity goals, and forming relationships with community partners. Matthew Rizzo, who supervised McBryde and later became the CEO of ARM, repeatedly called McBryde "an asset" to the agency. (Doc. No. 21-4 at 3; Doc. No. 21-6 at 3).

In July 2014, the board of directors for ARM placed the agency's then-CEO, Jonathan James, on administrative leave. Rizzo became the interim CEO; the board of directors selected him as the permanent CEO in October 2014. In August 2014, following discussions with other executive officers at ARM, including Wendy Shaheen, Jennifer Riha, and Rolanda Key, Rizzo announced changes to the Guided Paths program. The parties disagree as to the scope of these changes – alternately referring to these changes as a "realignment", (Doc. No. 15-1 at 9), or a "dismantling", (Doc. No. 19 at 148) – but agree that by the fall of 2014, Guided Paths was no longer a stand-alone program within ARM.

2

ARM describes the changes as being driven by efficiency concerns and a need to ensure compliance with the Ohio Administrative Code. (Doc. No. 15-1 at 9). The OAC requires supervisors of certain clinical services to maintain a specific level of licensure in order to supervisor other treatment providers. McBryde had not obtained these licenses so five other ARM employees reviewed and approved mental health and clinical services performed by Guided Paths staff members.

McBryde and Nance both strenuously objected to the restructuring. Nance believed the changes were "unfair." (Doc. No. 17 at 142). Nance had "poured [her] everything into Guided Paths, and to have it torn apart like this [was] heart-wrenching." (Doc. No. 17 at 142). McBryde thought he was having the program "stripped from [him]" and that the changes "undermine[d]" Guided Paths. (Doc. No. 19 at 153).

Shortly after the changes to Guided Paths were announced, McBryde received the first disciplinary action in his five years at ARM. Riha and Shaheen issued McBryde a notice of corrective action on August 24, 2014, for ignoring ARM procedures on hiring new employees and inappropriate communications with present and former ARM staff members. (Doc. No. 19-14).

The changes went into effect in September 2014. The portion of Guided Paths which served students at the Polly Fox Academy, a charter school for girls in grades 7 through 12 who were pregnant or raising a young child, was moved into the School-Based Services division of ARM. Adult addiction and other drug counseling services were moved to the Alcohol and Other Drug ("AOD") division, and mental health services were moved into ARM's Mental Health Division.

At this point, McBryde's title changed from Program Director of Guided Paths to Program Director of Adult AOD, though his pay and benefits did not change. McBryde began reporting to Christina Rodriguez, who was the Clinical Director of the AOD division.

3

On September 12, 2014, McBryde filed an internal grievance concerning his August 25 notice of corrective action and the decision to restructure Guided Paths. He sought to escalate his grievance to the second step of the grievance process on October 2, 2014, (Doc. No. 19-21), the same day as McBryde filed a charge of discrimination with the OCRC. (Doc. No. 18-13). Rizzo acknowledged receipt of McBryde's letter escalating his grievance on October 6, 2014, and indicated he would contact a member of the board of directors to set up a meeting pursuant to ARM policy. (Doc. No. 21-30).

McBryde received a second notice of corrective action on October 7, 2014. (Doc. No. 21-37). This second notice charged McBryde with a number of policy violations, including attendance, professionalism, an ethics violation, insubordination, and poor quality of work. (Doc. No. 21-37 at 1). ARM also contends it had received complaints about McBryde from two separate referral sources. As a result, McBryde was suspended for three and one-half days.

Shortly after McBryde was suspended, Lisa Rioux, ARM's Director of Administrative Services, reported McBryde reacted poorly when Rioux approached him to discuss questions concerning another employee. Rioux believed, based upon McBryde's tone, body language, and body positioning, that McBryde was attempting to intimidate her. (Doc. No. 20-28 at 4). A similar incident took place following McBryde's return from his suspension, though this incident instead involved Rodriquez, McBryde's supervisor. (Doc. No. 20-28 at 1-3).

Riha investigated these incidents. Riha spoke with both Rioux and Rodriquez, as well as several witnesses. (Doc. No. 20 at 182-186). Riha also notified McBryde she was investigating these allegations and attempted to schedule a meeting with him. Riha eventually notified McBryde by text message that he was not to come to work until the investigation was pending. During the investigation, however, ARM determined it would eliminate McBryde's position and declined to

4

reassign McBryde to another position due to his "unacceptable work performance." (Doc. No. 20-9). McBryde's employment with ARM ended on October 27, 2014.

### III. STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV. ANALYSIS

McBryde asserts claims for sex discrimination, race discrimination, and retaliation under both federal and state law.[1] Defendant moves for summary judgment on each of these claims. McBryde asserts there is a genuine dispute of material fact as to his race discrimination and retaliation claims, though he does not oppose Defendant's motion as to his sex discrimination claims. (*See* Doc. No. 30 at 69). Defendant is entitled to summary judgment because McBryde fails to offer evidence Defendant treated him differently because of his sex, and accordingly his claim is

---

[1] "Ohio courts use the same analysis employed by the federal courts for Title VII claims when analyzing discrimination claims brought under the Ohio Civil Rights Act." *Jones v. Butler Metro. Hous. Auth.*, 40 F. App'x 131, 135 (6th Cir. 2002) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981)).

dismissed *See, e.g., Laney v. Ohio Dep't of Youth Servs.*, 719 F. Supp. 2d 868, 881 (S.D. Ohio 2010), aff'd, 448 F. App'x 553 (6th Cir. 2011).

### A. RACE DISCRIMINATION

McBryde may establish a prima facie case of race discrimination by showing "(1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by someone outside the protected class or was treated differently than similarly-situated [individuals outside of the protected class] . . . ." *Amos v. McNairy Cnty.*, 622 F. App'x 529, 533–34 (6th Cir. 2015) (quoting *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir.2014) cert. denied, --- U.S. ---, 135 S.Ct. 783 (2015)). Defendant contends McBryde cannot establish either the second or the fourth element of the prima facie case.

#### 1. Adverse Employment Actions

As McBryde notes, "a plaintiff suffers an adverse employment action where there is (1) a termination of employment; (2) a demotion resulting in loss of benefits or salary reduction; (3) conferring of a less distinguished title; (4) a material loss of benefits; (5) significantly diminished material responsibilities or (6) other factors unique to the particular situation." *Jones v. Butler Metro. Hous. Auth.*, 40 F. App'x 131, 136 (6th Cir. 2002) (citing *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 882-83 (6th Cir.1996)).

McBryde identifies the following incidents as adverse employment actions: "denial of health insurance coverage as of June 9, 2014; the August 25, [2014] discipline; denial of bonus and pay raise in June/July 2014; being subjected to different terms and conditions of employment/position elimination/demotion/reassignment as of August/September 2014; the October 7, 2014 discipline; and the October 27, 2014 termination." (Doc. No. 30 at 54).

While McBryde argues these claims "should not be considered in isolation or unrelated to each other," he fails to identify evidence of how what he describes as "being subjected to different

6

terms and conditions of employment/position elimination/demotion/reassignment as of August/September 2014," constitutes an adverse employment action. (Doc. No. 30 at 54). Though McBryde was plainly unhappy about and hurt by ARM's decision to reorganize Guided Paths, he did not receive a pay cut, a reduction in benefits, "a less distinguished title, . . . [or] significantly diminished material responsibilities . . . ." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (citation omitted); *see also White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 795 (6th Cir. 2004), aff'd sub nom. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (An "action by an employer that makes an employee unhappy or resentful" is not an adverse action.); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998) ("A tangible employment action in most cases inflicts direct economic harm.").

Further, McBryde fails to establish Defendant's purported refusal to provide him with health insurance benefits prior to the 90th day after he became an employee was an adverse employment action. While the denial of health insurance benefits may constitute an adverse employment action under some circumstances, *see, e.g., Sherman v. Dallas County Community College District*, 2010 WL 2293165, at *5 (N.D. Tex., May 11, 2010), McBryde cannot establish Defendant denied him anything to which he was entitled. *Wofford v. Middletown Tube Works, Inc.*, 67 F. App'x 312, 315-16 (6th Cir. 2003); *cf. Roldan v. Berenda, Inc.,* No. 4:04-CV-62 AS, 2007 WL 2076032, at *8 (N.D. Ind. July 18, 2007) (Plaintiff established a genuine dispute of material fact by presenting evidence the defendant improperly denied the plaintiff health insurance benefits during a time period in which the plaintiff was eligible to receive those benefits and in which the defendant provided those benefits to other similarly-situated employees.). Under the terms of Defendant's health insurance policy, McBryde was not eligible to receive health insurance benefits until he had completed 90 days of employment with ARM. (Doc. No. 40-1 at 16-17).

7

Even if I credit McBryde's assertion that two other ARM employees, Dr. Cuneyd and Kristin Tolek, were permitted to enroll in ARM's health insurance plan before they had been employed for 90 days – a contention very much in doubt given Kristin Tolek's documented inability to remember the date on which she began working at ARM[2] – this assertion only shows the Toleks may have received a benefit they should not have. McBryde fails to show he was subjected to an adverse employment action. *Cf. Deleon*, 739 F.3d at 919 (An employee may establish an adverse employment action by presenting evidence of "a quantitative or qualitative change in the terms of the conditions of employment . . . [which] give[s] rise to some level of objective intolerability.").

For the purposes of establishing a prima facie case of race discrimination, McBryde appropriately identifies, as potentially-adverse employment actions, the purported denial of a promised bonus and pay raise in June or July 2014, his August 25, 2014 and October 7, 2014 disciplinary notices[3], and his October 27, 2014 termination.

### 2. Replacement / Similarly-Situated

The fourth element of the *McDonnell Douglas* prima facie case adapts to meet the appropriate context of a plaintiff's claims. A plaintiff may establish this part of a discrimination claim by showing the plaintiff was replaced by someone outside the protected class, or that "a comparable non-protected person was treated better . . . for the same or similar conduct." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992).

---

[2] On October 31, 2014, Ms. Tolek signed an affidavit asserting she began work on April 30, 2014, and began receiving benefits on August 1, 2014. (Doc. No. 40-3). Dr. Tolek indicated the same dates were true for his employment and benefits. (Doc. No. 40-4). On May 5, 2016, following her resignation from ARM, Ms. Tolek stated she began working part-time at ARM in May 2014, and became a full-time employee on July 29, 2014. (Doc. No. 34-6 at 5). On May 26, 2017, Ms. Tolek signed an affidavit asserting she began working part-time on a contractual basis at ARM in June 2014, and did not become a full-time employee until August 1, 2014. (Doc. No. 34-6 at 1).

[3] While ARM did not issue any punishment to McBryde in connection with the August 25 notice, I conclude it is appropriate to consider that notice along with his October 7 notice, as the latter notice contains a description of similar behavior.

8

If a plaintiff's position was eliminated pursuant to a reorganization, the plaintiff must come forward with evidence "tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990), cert. denied, 498 U.S. 878 (1990)).  While an employer has not truly "eliminate[d]" a plaintiff's position if the employer replaces the employee after the employee's discharge, a plaintiff has not been replaced "when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Barnes*, 896 F.2d at 1465.

In the "disciplinary context," similarly-situated individuals "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352 (quoting *Mitchell,* 964 F.2d at 583).

### a.  Bonus / Pay Raise

McBryde contends he did not receive pay raises and bonuses he had been promised between July and September 2014.  (Doc. No. 19 at 236-39).  He asserts Defendant's failure to give him a raise or bonus was discriminatory because other employees outside of the protected class received pay raises, bonuses, or both.  McBryde claims Rioux, Erin Bajas, Rodriguez, and Martha Campbell were similarly-situated employees who were treated differently.[4]

McBryde fails to show Rioux, Bajas, or Rodriguez was a similarly-situated employee.  As he acknowledges, Rioux received a pay raise when she was promoted from Administrative Services

---

[4]  McBryde also identifies Jeff Earle, who took over as the director in charge of most of the programs previously covered by Guided Paths, as a similarly-situated employee. (Doc. No. 30 at 61).  McBryde does not claim Earle received a pay increase or bonus, however, and I already concluded McBryde's transfer does not qualify as an adverse employment actions.

9

Manager to Director of Administrative Services. (*See* Doc. No. 30 at 46). Bajas also received a pay raise when she was promoted from Staff Development and Quality Improvement Manager to Director of Continuous Quality Improvement. (Doc. No. 30 at 51). Rodriguez received a pay raise and promotion as well, as a result of a change in her responsibilities when she became Clinical Director of AOD. (Doc. No. 28-7). Rioux, Bajas, and Rodriguez are not similarly-situated because McBryde was not promoted and was not assigned additional responsibilities.

McBryde also fails to show Campbell was similarly-situated. Though McBryde's burden at the prima facie stage is not onerous, he must show he is similarly-situated in "all relevant respects" to the individual to which he seeks to compare himself. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (quoting *Ercegovich*, 154 F.3d at 353). McBryde fails to show how Campbell was similarly-situated when she received a pay raise three months after McBryde was terminated and nearly five months after McBryde did not receive a pay raise he purportedly was promised. (*See* Doc. No. 30 at 32, 49).

Finally, McBryde also claims Riha was treated more favorably than he was when "she was promoted by Rizzo on September 22, 2014, to Vice President of Operations." (Doc. No. 30 at 60). McBryde does not present evidence, however, that he applied or was qualified for the promotion Riha received, or that he applied for any other promotion. *See, e.g., Evans v. Toys R Us, Inc.*, 221 F.3d 1334, at *11(6th Cir. 2000) (unreported table decision) (affirming district court's grant of defendants' summary judgment motion because plaintiff failed to identify any similarly-situated, non-minority employee who was promoted instead of him). As a result, Riha is not a similarly-situated employee.

McBryde has not identified a similarly-situated employee who received better treatment with regard to pay or position. Therefore he fails to establish a prima facie case of race discrimination with regard to his pay or position, and ARM is entitled to summary judgment on this claim.

### b. Disciplinary Notices and Termination

Shaheen issued McBryde a "precautionary citation" on August 25, 2014, indicating he failed to follow ARM policy by recruiting several new staff members for the Guided Paths program and when he extended a job offer without obtaining HR's approval of the proper salary range. (Doc. No. 19-14 at 1). Shaheen also highlighted certain topics and modes of communication which ARM considered inappropriate – McBryde's statements that ARM likely would not provide bonuses to staff members "because the CEO has taken all of the money" and that Earle had been fired and escorted out of his previous employment and should not have been hired as the Director of School Based Services, as well as McBryde's "[c]ontinued communication with a contract therapist whose contract was not renewed." (Id.). Shaheen informed McBryde of ARM's expectations moving forward and stated "further violations will result in further disciplinary action." (Id.).

Subsequently, on October 7, 2014, McBryde was suspended for three and a half days due to a number of "concerns and problems" that had arisen "in addition to the previous concerns addressed in [his] previous citation." (Doc. No. 19-15 at 2). This notice, issued after Rodriguez became McBryde's supervisor, described

> (i) McBryde's failure to meet ARM's attendance and work-hours expectations;
>
> (ii) insubordination, based upon McBryde's disregard of ARM's instruction concerning the placement of a staff member and his reassignment of clients from certain staff members to others in order to retain those clients within "'his' program";
>
> (iii) McBryde's decision to execute a memorandum of understanding with Polly Fox Academy on ARM's behalf without prior authorization and to represent that he would supervise a social worker placed at Polly Fox despite lacking the licensure necessary to do so;
>
> (iv) McBryde's "fail[ure] to communicate the expected information regarding the relocation and transition" of the AOD program;
>
> (v) issues concerning caseload sizes, documenting medical necessity for treatment, and missing documentation for accreditation and certification standards; and

(vi)   complaints from stakeholders regarding McBryde's handling of certain program services, and reports of "unprofessional behavior, belligerent communication[,] and poor program management."

(Doc. No. 19-15 at 1-2).

McBryde was terminated shortly after returning from his suspension.

McBryde argues he was replaced, after his termination, by two individuals who were not part of his protected class – Rodriguez and Campbell. (Doc. No. 30 at 62). A plaintiff, however, has not been replaced "when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Barnes*, 896 F.2d at 1465. Therefore, McBryde was not "replaced," and he cannot establish a prima facie case of race discrimination on this basis.

Nor can he establish a prima facie case based upon the circumstances of his disciplinary actions or his eventual termination. McBryde does not identify any similarly-situated non-protected employees who engaged in conduct similar to his own in severity or frequency. Therefore, he cannot show his discipline, termination, or both, was discriminatory. *Mitchell*, 964 F.2d at 582-83.

### 3. PRETEXT

Even if I were to assume McBryde could establish a prima facia case of race discrimination, ARM still is entitled to summary judgment. Defendant contends McBryde was discharged based upon its investigation into McBryde's "intimidating, insubordinate[,] and inappropriate actions." (Doc. No. 15-1 at 23).

McBryde fails to offer evidence from which a jury could conclude Defendant's reasons were a pretext for discrimination. *See, e.g., Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004) (A plaintiff may undermine the credibility of the employer's explanation by showing the explanation had no basis in fact, did not actually motivate the plaintiff's termination, or was insufficient to motivate the termination.). While McBryde contends none of Defendant's proffered explanations

are true, (Doc. No. 30 at 63-65), the evidence he offers does not prove those explanations are untrue, or overcome ARM's "reasonable reliance on the particularized facts that were before it at the time the decision was made." *Wright*, 455 F.3d at 708.

An employer's decision to discipline or terminate an employee is protected by the honest-belief rule so long as "the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (citations omitted). "If the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009); *see also Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) ("When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'") (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713-15 (6th Cir. 2007)).

Defendant's investigations were sufficient to identify particularized facts upon which it reasonably relied. Riha received complaints from both Rioux and Rodriguez about their interactions with McBryde, including the alleged incidents around and after McBryde's suspension. Riha reviewed written statements from Rioux and Rodriguez and interviewed both of them, in addition to interviewing two other ARM employees, Geri George and Judy Lytle, who had observed the incidents. (Doc. No. 20 at 180-86). From those interviews, Riha concluded McBryde had acted in an aggressive and intimidating manner, including to Rodriguez, his direct supervisor. Defendant's decision not to interview McBryde before terminating him does not undermine the validity of its investigation. *See, e.g., Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998) (affirming summary judgment in favor of employer who did not interview plaintiff while investigating plaintiff for lying).

13

Further, Defendant reasonably relied on the information Shaheen and Rodriguez described in McBryde's disciplinary notices. *Burks v. Yellow Transp., Inc.*, 258 F. App'x 867, 875 (6th Cir. 2008) (affirming summary judgment in favor of employer who relied on evidence of "specific instances of [the plaintiff's] poor performance and poor attitude"). Those notices described conversations between McBryde and various ARM staff members, and McBryde contested the basis of those notices in discussions with Shaheen, Riha, Rodriguez, and Rizzo. (Doc. No. 19 at 190-99).

While it is true an employer may offer so many explanations for its actions that it raises questions as to the appropriateness of its investigatory process, McBryde fails to show that any one of ARM's explanations is "so fishy and suspicious" as to defeat its summary judgment motion, much less "a multitude of suspicious explanations" which would prohibit the application of the honest belief rule as required by controlling law. *Smith*, 155 F.3d at 809. Moreover, "a plaintiff must demonstrate that the employer's reasons (*each* of them, if the reasons independently caused [the] employer to take the action it did) are not true." *Burks*, 258 F. App'x at 876 (citations and internal quotation marks omitted) (emphasis in original). McBryde's claim that Defendant has changed its reasons for terminating him does not establish race discrimination was the real reason for his termination.

McBryde also argues ARM's proffered reasons for disciplining and terminating him did not actually motivate those actions. (Doc. No. 30 at 64-65). Ordinarily, this method of demonstrating pretext requires the plaintiff to admit "the factual basis underlying the employer's proffered explanation and further [to admit] that such conduct could motivate dismissal." *Pennington v. W. Atlas, Inc.*, 202 F.3d 902, 909 (6th Cir. 2000). McBryde does not admit these things, but instead claims 13 other members of his protected class also claim to have suffered adverse employment actions as the result of racial discrimination. (Doc. No. 30 at 65).

14

"[T]he plaintiff's subjective skepticism regarding the truth of an employer's representation[, however,] does not raise a triable issue as to pretext." *Hedrick*, 355 F.3d at 462. Though McBryde plainly believes racial discrimination is rampant at ARM, his interpretation of the conduct of, or decisions made by, certain administrators does not create a genuine dispute of material fact as to whether his disciplinary notices or his termination were motivated by his race.

Finally, even if I assumed the purported early availability of health insurance benefits to the Toleks could constitute an adverse employment action as to McBryde, Defendant still would be entitled to summary judgment on that portion of McBryde's claim. An employer's inconsistent enforcement of its internal policies does not automatically support an inference that that inconsistency is a pretext for racial discrimination, and McBryde offers no evidence that impermissible race discrimination was the reason he was not offered the opportunity to obtain health insurance benefits in a manner inconsistent with Defendant's policy. *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 430 (6th Cir. 2007).

McBryde has not established a genuine dispute of material fact as to his race discrimination claim, and Defendant is entitled to summary judgment on that claim.

**B. RETALIATION**

McBryde may establish a prima facie case of retaliation by showing: (1) he engaged in protected activity; (2) Defendant knew of his protected activity; (3) Defendant then took "materially adverse" actions against him; and (4) McBryde's protected conduct was the but-for cause of the adverse action. *Burns v. City of Saginaw*, 601 F. App'x 353, 357 (6th Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).

McBryde asserts he engaged in protected activity on three occasions – (1) on August 25, 2014, when he told Shaheen he "didn't have the complexion for the protection"; (2) on October 2, 2014, when he filed a charge of discrimination with the Equal Employment Opportunity

15

Commission and the Ohio Civil Rights Commission; and (3) on October 16, 2014, when he told Rodriguez he felt threatened and discriminated against because of his race. (Doc. No. 30 at 67-68).

At the prima facie stage, a plaintiff may establish a causal connection between protected activity and an adverse employment action through temporal proximity alone. *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 502 (6th Cir. 2013) (Evidence that plaintiff was terminated approximately one month after his last complaint of discrimination was sufficient to support "an inference of causation"). Viewing the evidence in the light most favorable to him, McBryde offers sufficient evidence to establish a prima facie case of retaliation.

Temporal proximity alone, however, is not sufficient to defeat an employer's proffered non-retaliatory reason for an adverse employment action. *See, e.g., Amos*, 622 F. App'x at 538. As I discussed above, ARM asserts it terminated McBryde as a result of his "intimidating, insubordinate[,] and inappropriate actions." (Doc. No. 15-1 at 23).

McBryde must demonstrate Defendant's reasons are pretextual and do not support Defendant's disciplinary actions or his "termination <u>when it occurred</u>." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 509 (6th Cir. 2014) (emphasis added). McBryde fails to make this showing.

McBryde did not engage in any protected conduct until after he received his first disciplinary notice from Shaheen. (Doc. No. 19 at 185-87). That notice described McBryde's failure to follow ARM's policies and his "[i]nappropriate communication with ARM staff." (Doc. No. 19-14 at 1). ARM informed McBryde he could be subject to further discipline if his conduct did not improve, and the record evidence shows his conduct instead deteriorated. (Doc. No. 19-15).

While McBryde disputes the contents of his disciplinary notices, he has not presented sufficient evidence to show Defendant did not have an honest belief in its proffered reasons for terminating him or from which a jury could conclude the real reason for Defendant's adverse employment actions was retaliation for McBryde's protected activity. *Tingle v. Arbors at Hilliard*, 692

F.3d 523, 531 (6th Cir. 2012); *Herrera*, 545 F. App'x at 503-04. Further, while McBryde did not have a history of disciplinary issues prior to August 2014, he fails to show Defendant's disciplinary actions were the result of "closer disciplinary scrutiny after exercising Title VII rights," rather than an appropriate response to documented and problematic conduct. *Evans v. Prospect Airport Servs., Inc.*, 286 F. App'x 889, 895 (6th Cir. 2008).

McBryde fails to demonstrate a genuine dispute of material fact, and Defendant is entitled to summary judgment on McBryde's retaliation claim.

V. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment as to McBryde's claims, (Doc. No. 15), is granted.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge